# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Cr. ID. No.  1702000035 |
| | ) | 1702000526 |
| | ) | |
| JERMAINE TINGLE, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted:  June 17, 2022
Decided: August 26, 2022

## COMMISSIONER'S REPORT AND RECOMMENDATION THAT DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF SHOULD BE DENIED

Erika Flaschner, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, Attorney for the State.

Benjamin S. Gifford, IV, Esquire and Natalie S. Woloshin, Esquire, Wilmington, Delaware, Attorneys for Defendant Jermaine Tingle

PARKER, Commissioner

This 26th day of August 2022, upon consideration of Defendant's Motion for Postconviction Relief, it appears to the Court as follows:

## BACKGROUND AND PROCEDURAL HISTORY

In 2017, Defendant Jermaine Tingle, along with codefendants Stephen Dunfee and Kristen Butler, was indicted on multiple drug and firearm offenses.[1]

Tingle's trial counsel filed two motions to suppress. The first, filed on October 4, 2017, sought to suppress the evidence seized pursuant to the search warrants on the ground that there was a misstatement in the affidavit of probable cause.[2] On December 1, 2017, the Superior Court denied the motion finding it clear on the face of the warrants that the questioned reference was a typographical error.[3]

The second motion to suppress, filed on December 5, 2017, was based on alleged late discovery from the State.[4] Tingle sought to suppress one of the drug lab reports and the police officer expert testimony regarding drug dealing based on the late submission from the State.[5] The Superior Court denied the motion.[6]

---

[1] As to Criminal ID No. 1702000035, Superior Court Docket Nos. 80 & 81;
As to Criminal ID No. 1702000526, Superior Court Docket Nos. 78 & 79: Appendix to the Defendant's *Amended Motion for Postconviction Relief ("Def. App.")* at pgs. A49-56, 112-120.
[2] *Def. App.* 70-75.
[3] As to Criminal ID No. 1702000035, Superior Court Docket No. 21;
As to Criminal ID No. 1702000526, Superior Court Docket No. 17 -Order dated December 1, 2017 denying motion to suppress.
[4] *Def. App.* 124-128.
[5] *Id.*
[6] *Def. App.* 198.

1

If convicted of all the charges at trial, Tingle was facing a minimum-mandatory jail sentence of at least 65 years as a habitual offender. Tingle rejected the State's offer to a guilty plea to two of the fourteen charges (Conspiracy Second Degree and Possession of a Firearm During the Commission of a Felony ("PFDCF") with a sentence recommendation of a total of 27 years of prison time, with a 25-year minimum-mandatory cap.[7] As discussed more fully below, following his jury trial, Tingle was ultimately sentenced to 20 years of unsuspended prison time, with a 17-year minimum-mandatory cap. A sentence more favorable than the plea offered by the State.

Tingle's trial was scheduled to proceed in a joint trial along with his two codefendants. The other two defendants, Dunfee and Butler, failed to appear for trial.[8] Tingle was the only defendant who proceeded to trial on January 3, 2018.

Following a four-day trial, on January 9, 2018, a Superior Court jury convicted Tingle of two counts of drug dealing, two counts of aggravated possession, two counts of conspiracy second degree, one count of possession of a firearm by a person prohibited ("PFBPP"), one count of possession of drug paraphernalia, one count of drug dealing with an aggravated factor, and one count

---

[7] *Def. App.* 199-201; As to Criminal ID No. 1702000035, Superior Court Docket No. 34; As to Criminal ID No. 1702000526, Superior Court Docket No. 27 - rejected plea offer.
[8] *Def. App.* 185-187.

of use of a cellular device while driving.[9]  The Superior Court jury found Tingle not guilty of PFDCF.[10]

On September 21, 2018, Tingle was sentenced.  Prior to sentencing, the Superior Court granted the State's motion to declare Tingle an habitual offender on the PFBPP conviction.[11]  The Superior Court granted the defense motion to consolidate the felony drug convictions for the purpose of sentencing.[12] Tingle was sentenced to a total of fifty-two (52) years of Level V incarceration, suspended after twenty (20) years, followed by eighteen (18) months at Level III probation.[13] Seventeen (17) of the twenty (20) years of unsuspended Level V time constituted a mandatory sentence.[14]

Tingle filed a direct appeal to the Delaware Supreme Court.  On May 10, 2019, the Delaware Supreme Court determined that the appeal was without merit and affirmed the judgment of the Superior Court.[15]

On June 20, 2019, Tingle filed a *pro se* motion for postconviction relief and a request for the appointment of counsel.[16]  The Court granted Tingle's request for

---

[9] *Def. App.* 656-659.
[10] *Def. App.* 657-658.
[11] *Def. App.* 721-722.
[12] *Def. App.* 765-766.
[13] *Def. App.* 792-800.
[14] *Id.*
[15] *Tingle v. State,* 2019 WL 2079060 (Del.).
[16] *Def. App.* 943-947; 948-951.

the appointment of counsel.[17]  On October 29, 2020, appointed counsel filed an Amended Motion for Postconviction Relief.  Thereafter, trial counsel submitted an Affidavit responding to Tingle's claims.  The State submitted a response and Tingle submitted a reply thereto.

Following briefing on the motion, on April 13, 2022, a hearing was held during which the parties were instructed to submit supplemental briefing on certain issues.  On April 20, 2022, trial counsel submitted a supplemental submission, and, on June 17, 2022, both the State and defense counsel filed their respective supplemental submissions.  Tingle's Rule 61 motion is now fully briefed and ripe for consideration.

## FACTS

On January 31, 2017, members of the Delaware State Police Governor's Task Force were on patrol in the City of Wilmington.[18]  At approximately 9:00 p.m., the Officers were at a traffic light behind a black Kia Sportage and observed the driver of the vehicle talking on his cell phone holding the phone at his ear.[19]  A motor vehicle stop was conducted for the cell phone violation and Tingle was

---

[17] *Def. App.* 952.
[18] *Def. App.* 952.
[19] *Def. App.* 223-225.

identified as the driver, and Stephen Dunfee was identified as the front passenger.[20] The vehicle Tingle was driving was a rental car.[21]

During the traffic stop, both Tingle and Dunfee engaged in suspicious behavior. Tingle's hands were shaking and he was trying to control his breathing.[22] Dunfee was eventually removed from the vehicle and found to be in possession of 650 bags of heroin.[23] A search incident to the arrest of Tingle yielded approximately $2,000 of suspected drug proceeds and a key to an Audi was found in the center console of the Kia.[24] The money found in Tingle's pocket was rubber banded with small, black rubber bands commonly used to package bundles of heroin.[25] Tingle and Dunfee were arrested and taken into custody.[26]

Of the 650 bags of heroin, 638 were stamped "100%" and 12 were not stamped. Tests confirmed that the stamped bags weighed approximately 4.36 grams and the unstamped bags weighed approximately .05 grams.[27] The amount of heroin seized would retail for $1,750-$2,000.[28]

Detective Stewart from the New Castle County Police Department testified at trial as an expert. He testified that drug dealers frequently use rental cars, so

[20] *Def. App.* 225-227.
[21] *Def. App.* 227.
[22] *Def. App.* 229.
[23] *Def. App.* 232-237; 662-663.
[24] *Def. App.* 234.
[25] *Def. App.* 110-111.
[26] *Def. App.* 233.
[27] *Def. App.* 662-663.
[28] *Def. App.* 447.

they are not always driving the same vehicle, and they are not easily identified by police or individuals that want to rob them.[29]   Detective Stewart also testified that in many instances drug dealers work in pairs, one has the money, the other has the drugs.[30]   The person higher up in the dealing scheme would be the person with the money.  That person would usually want to distance himself from the drugs.[31]

At the time of the arrest, Tingle was on Level III probation with a reported address of 824 N. West Street, Apartment 14.[32] Probation Officer Vettori responded to the car stop providing back-up to the officers already at the scene.[33] Following the car stop, Officer Vettori contacted his supervisor and conducted a case conference regarding the facts of the car stop.[34]   Approval was granted to conduct an administrative search at Tingle's reported address.[35]

At the time of the search, Tingle's uncle was present.[36]  He told police that Tingle lived there, slept on the sofa, and kept his belongings in the closet in the bedroom and a white dresser in the living room.[37]  In the bedroom closet, police located bins of male clothing, letters addressed to Tingle, and a black plastic bag

---

[29] *Def. App.* 448, 453.
[30] *Def. App.* 449.
[31] *Def. App.* 475-476.
[32] *Def. App.* 110-111.
[33] *Def. App.* 110-111, 299-300, 307-308.
[34] *Def. App.* 110-111.
[35] *Def. App.* 110-111.
[36] *Def. App.* 303.
[37] *Def. App.*  303; 306.

filled with cash.[38]  Inside the plastic bag, there were ten stacks of cash wrapped in black rubber bands of $2,000 each, totaling $20,000.[39]  In the white dresser, police found an additional $1,065 cash in a pair of jeans.[40]

The next morning, on February 1, 2017, Detective Wilkers of the Wilmington Police Department learned that Tingle and Dunfee had been arrested.[41] Completely separate from the car stop with the Delaware State Police on the evening of January 31, 2017, the Wilmington Police Department had been conducting a drug investigation involving Tingle and Dunfee involving the illegal sale of narcotics from a home at 70 Hillside Road, Wilmington, Delaware.[42] Tingle was frequently observed coming and going to that residence, a single-family house with an attached garage, in a blue Audi A4 sedan.[43]

Independent of the traffic stop the evening before, a search warrant had already been prepared for that Hillside Road residence.  When Detective Wilkers learned of the traffic stop, he wanted to immediately execute the search warrant at the residence before any evidence could be removed.[44]

---

[38] *Def. App.* 303-304.
[39] *Def. App.* 304.
[40] *Def. App.* 306.
[41] *Def. App.* 312.
[42] *Def. App.* 312-313.
[43] *Def. App.* 312-314.
[44] *Def. App.* 312-314.

On February 1, 2017, a search warrant was executed at the Hillside Road residence.[45] Upon arrival at the residence, Kristen Butler advised the police officers that she was Dunfee's girlfriend and identified the bedroom she and Dunfee shared.[46] In that bedroom, police found a digital scale, several bags of heroin stamped "Sony" in a dresser, and a similar bag of heroin on the floor. In an unlocked safe in that bedroom, police found a partial bundle of heroin, $870 cash, and an unloaded .50 caliber Desert Eagle firearm.[47] Detective Wilkers testified that it was the only .50 caliber firearm that he had ever recovered in his eight years with the Wilmington Police Department.[48]

Although the firearm was swabbed for DNA, due to a mixed DNA profile indicating that the firearm was handled by multiple people, no conclusions could be drawn as to whether any particular individual handled the firearm.[49] No latent fingerprints of any value were found on the firearm.[50]

In the garage of the Hillside residence, police found the blue 2002 Audi A4, which Detective Wilkers had seen Tingle, and only Tingle, drive.[51] The Audi was

---

[45] *Def. App.* 313.
[46] *Def. App.* 314-315.
[47] *Def. App.* 318-324.
[48] *Def. App.* 326-327. The firearm was an Israeli Military Industries Desert Eagle .50 caliber semi-automatic pistol. It retailed for about $1,700, weighed four and a half pounds, and was one of the more powerful handguns on the market. *Id.* at 378-380.
[49] *Def. App.* 375, 395-399.
[50] *Def. App.* 107-108.
[51] *Def. App.* 328, 354-355.

locked.[52]   In the garage, police also found approximately 200 grams of marijuana in a heat-sealed plastic bag placed in a dog food bag.[53]   On the garage floor next to the Audi, police found a red plastic bag that contained Ziplock bags and a black plastic bag.[54]   Inside the black bag were additional items used to package heroin. Specifically, inside the black bag were clear plastic "Apple bags" (used to package individual bags of heroin), unused blue glassine bags, a package of 300 black rubber bands, a straw cut diagonally (which is commonly used to fill heroin bags), a bottle of Mannitol (which is commonly used to cut heroin to increase weight), and five glassine bags containing heroin, stamped "Pinky".[55]

The doors to the blue Audi A4 were locked.[56] No key to the Audi was found at the Hillside residence.[57]   Police towed the Audi to the police station, obtained a separate search warrant, and searched it.[58]   The Audi was registered to Tingle's mother, Anna Watson.[59]   Inside the vehicle, police found multiple documents and personal items belonging to Tingle.[60]   A wallet belonging to Tingle was also found

---

[52] *Def. App.* 328.
[53] *Def. App.* 328.  The amount of marijuana found would be the equivalent of one thousand marijuana cigarettes. *Id.* at 452.
[54] *Def. App.* 328-329.
[55] *Def. App.* 329-334.
[56] *Def. App.* 328, 336.
[57] *Def. App.* 364-365.
[58] *Def. App.* 336-337.
[59] *Def. App.* 336.
[60] *Def. App.* 337-341.

in the vehicle.[61]  In the trunk of the Audi, police found a green cellophane wrapped

package that contained approximately 650 bags of heroin.[62]  The heroin was

grouped in bundles of 13 bags, held together by black rubber bands, and the vast

majority of the bags were stamped "100%".[63]  The heroin located in the trunk of

Tingle's vehicle would retail for around $2,000.[64]

The heroin found in the trunk of Tingle's car (stamped "100%") was the

same brand as the heroin found on Dunfee (also stamped "100%") during the car

stop the evening before.[65]

Tingle's documents found in the Audi referenced three different mailing

addresses for Tingle.[66]  Detective Stewart testified that drug dealers are often

associated with several different addresses to avoid being detected. The more the

dealer moves around the safer he is going to be.[67]

Detective Stewart also testified that drug dealers, in order to avoid being

detected, tend to drive rental cars and change them on a regular basis.[68]  Tingle was

---

[61] *Def. App.* 337, 341.
[62] *Def. App.* 337, 342.
[63] *Def. App.* 337, 342-344.
[64] *Def. App.* 453.
[65] *Def. App.* 344, 453.
[66] *Def. App.* 337-342. (a pay stub for Tingle showed his address at 914 E. 7th Street; a rental application showed Tingle's address as 211 N. New Street, Dover; and a receipt from Meineke Car Care Center showed Tingle's address as 824 N. West Street).
[67] *Def. App.* 453.
[68] *Def. App.* 448, 453.

driving a rental car the night of the car stop but he also drove the Audi which was in the garage at the Hillside residence. He also drove a black truck.[69]

Tingle was the only person in possession of the key to the locked Audi in the garage at the Hillside residence. The Audi key found in the center console of the Kia that Tingle was driving at the time of the traffic stop was the key to Audi.[70]

At trial, Tingle and his girlfriend, Amanda Long, testified on his behalf.[71] Tingle's defense, essentially, was that he knew nothing about the drugs, Dunfee was the drug dealer, and that Tingle was in the wrong place at the wrong time when they were pulled over by the Delaware State Police.[72]

Amanda testified that she also lived at the Hillside residence along with Dunfee and his girlfriend and that Tingle left his Audi in the garage to get his car serviced. They both testified that something was wrong with the brakes and that Dunfee was going to take the car in for servicing.[73] Amanda testified that in addition to the blue Audi, Tingle also had a black truck.[74] She testified that she thought Dunfee had an extra key to the Audi to take it to the mechanic.[75]

On the night of the traffic stop, Tingle was driving a rental car not his black truck or his Audi. Although they both testified that the Audi was at the Hillside

---

[69] *Def. App.* 496-498.
[70] *Def. App.* 234, 348-350, 552.
[71] *Def. App.* 490, 514.
[72] *Def. App.* 515-540.
[73] *Def. App.* 493-500; 525-526.
[74] *Def. App.* 498.
[75] *Def. App.* 499-500.

11

residence so that Dunfee could take the car in for servicing, there was no key found at the Hillside residence. The only key found was in Tingle's possession.[76]

As for the $20,000 found in his bedroom closet, Tingle testified that in his work for his mother's charitable organization, Anna's House, he collected donations.[77] He testified that he would keep the donations, which were mostly cash, until the accountant came up from Virginia to collect them.[78]

The State argued that Tingle claimed to be working for his mother's nonprofit organization doing clerical work but that it made no sense that a nonprofit organization would store $20,000 in donations in the back of an employee's closet in a plastic bag, rubber banded in ten stacks of $2,000 each.[79] The State argued that the money found in Tingle's closet was money he received for selling drugs. Nonprofits put their cash in a bank. Drug dealers cannot. Nonprofits can collect donations in the form of checks and credit card donations. Drug dealers cannot.[80]

The Superior Court jury found Tingle not guilty of PFDCF, and guilty of the remaining counts of the indictment.

---

[76] *Def. App.* 234, 348-350.503-504.
[77] *Def. App.* 539-540.
[78] *Def. App.* 539-540.
[79] *Def. App.* 583-586.
[80] *Def. App.* 583-586.

## TINGLE'S RULE 61 MOTION

In the subject Rule 61 motion, Tingle raises seven ineffective assistance of counsel claims.

In order to prevail on an ineffective assistance of counsel claim, Tingle must meet the two-pronged *Strickland* test by showing that: (1) counsel performed at a level "below an objective standard of reasonableness" and that, (2) the deficient performance prejudiced the defense.[81]

The first prong requires the defendant to show by a preponderance of the evidence that defense counsel was not reasonably competent, while the second prong requires him to show that there is a reasonable probability that, but for defense counsel's unprofessional errors, the outcome of the proceedings would have been different.[82] In order to prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate that, but for counsel's alleged error, he would have been acquitted.[83]

Mere allegations of ineffectiveness or conclusory statements will not suffice; instead, a defendant must make and substantiate concrete allegations of actual prejudice.[84] The test is not whether the defendant can demonstrate that the error

---

[81] *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).
[82] *Id.* at 687-88, 694.
[83] *Couch v. State,* 945 A.2d 593 (Del. 2008).
[84] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990); *State v. Gonzalez,* 2019 WL 1762976, *1 (Del.).

had some "conceivable effect" on the outcome but rather whether the error was so serious as to deprive the defendant of a fair trial.[85]

Although not insurmountable, the *Strickland* standard is highly demanding and leads to a strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance.[86] Moreover, there is a strong presumption that defense counsel's conduct constituted sound trial strategy.[87]

In considering post-trial attacks on counsel, *Strickland* cautions that trial counsel's performance should be reviewed from the defense counsel's perspective at the time decisions were being made.[88] It is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.[89] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting efforts of hindsight. Second guessing or "Monday morning quarterbacking" should be avoided.[90]

A defendant is not guaranteed perfect representation, only a reasonably competent attorney. There is no expectation that competent counsel will be a

---

[85] *State v. Gonzalez,* 2019 WL 1762976, *1 (Del.); *Harrington v. Richter,* 131 S.Ct. 770, 791 (2011).
[86] *Albury v. State*, 551 A.2d 53, 59 (Del. 1988); *Salih v. State*, 2008 WL 4762323, at *1 (Del. 2008).
[87] *Strickland v. Washington,* 466 U.S. 668, 689 (1984).
[88] *Id.*
[89] *Id.*
[90] *Id.*

flawless strategist or tactician.[91] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. Consequently, defense counsel must be given wide latitude in making tactical decisions.[92] Counsel is permitted to make reasonable decisions that particular investigations are unnecessary. A defense counsel can avoid activities that appear distractive for more important duties. There is a strong presumption that defense counsel's focus on certain issues to the exclusion of others reflects trial tactics rather than sheer neglect.[93]

With this backdrop in mind, we turn to Tingle's specific claims.

## Claim I: Failing to Challenge the Administrative Search

Tingle claims that trial counsel was ineffective for failing to file a motion to suppress the administrative search of his residence at 824 N. West Street, arguing that there was no nexus between any suspected wrongdoing and the residence. At the residence, over $20,000 in suspected drug proceeds was found during the search.

Trial counsel advised that he did not file a suppression motion of the search of Tingle's residence at 824 N. West Street because he did not believe any such

---

[91] *Harrington v. Richter,* 131 S.Ct. 770, 787-792 (2011).
[92] *Id. at* 788-789.
[93] *Id. at* 787-790.

motion was meritorious.[94] Tingle was a Level III probationer and was arrested following a traffic stop. At the time of the traffic stop, Tingle was in possession of over $2,000 banded together with small, black rubber bands, and his passenger was in possession of a substantial quantity of heroin packaged for sale.[95]

Tingle's probation officer responded to the car stop, and following the car stop, contacted his supervisor and conducted a case conference regarding the facts of the car stop.[96] The facts entailed that Tingle was the driver of a rental vehicle that was stopped, that he was in possession of over $2,000 cash banded together with small, black rubber bands commonly used to package bundles of heroin and the passenger, Dunfee, had a large amount of heroin on him.[97] Law enforcement is aware that drug dealers frequently use rental cars and work in pairs.[98] One person has the money, the other the drugs.[99]

Given these facts, approval was granted to conduct an administrative search at Tingle's reported address.[100] Given these facts, there was reasonable suspicion to believe that Tingle was engaged in drug dealing. Given these facts, trial counsel did not believe that there was any basis to move to suppress the search of Tingle's

---

[94] See, Trial Counsel's supplemental submission dated April 20, 2022, at pgs. 1-2.
[95] Trial Counsel's supplemental submission dated April 20, 2022, at pgs. 1-2.
[96] *Def. App.* 110-111, 299-300, 307-308.
[97] *Def. App.* 110-111.
[98] *Def. App.* 448-449, 453, 475-476.
[99] *Id.*
[100] *Def. App.* 110-111.

16

residence.[101]  An ineffective assistance of counsel claim based on the failure to object to evidence is without merit if trial counsel lacked a legal or factual basis to object to the evidence.[102]

An administrative search of a probationer's residence requires only reasonable suspicion that the probationer is in violation of his probation.[103]  This standard is met when the totality of the circumstances indicate that the probation officer had a particularized and objective basis for the suspected legal wrongdoing.[104]

Tingle's reliance on *Culver v. State*[105] and *State v. Johnson*[106] to support his position that the administrative search was improper is misplaced.  Each case must be viewed based on the totality of the circumstances presented therein.  The administrative searches in *Culver* and *Johnson* stemmed from unverified anonymous tips that the probationer was involved in criminal activity.[107]  On the other hand, this case stemmed from Tingle's probation officers and other law enforcements' own personal observations.

---

[101] Trial Counsel's supplemental submission dated April 20, 2022, at pgs. 1-2.
[102] *State v. Exum,* 2002 WL 100576, at *2 (Del.Super.), *aff'd,* 2002 WL 2017230, at *1 (Del.).
[103] *Jacklin v. State,* 2011 WL 809684, *2 (Del.); *Donald,* 903 A.2d at 318-319 (Del. 2006).
[104] *Jacklin,* 2011 WL 809684 at *2.
[105] *Culver v. State,* 956 A.2d 5 (Del. 2008).
[106] *State v. Johnson,* 2014 WL 6661154 (Del.Super.).
[107] See, *Culver,* 956 A.2d at 8 (police received an anonymous tip from an unknown caller with no past proven reliability); *Johnson,* 2014 WL 6661154, at *1, 3.

Tingle's probation officer followed the proper procedures prior to conducting the search of Tingle's residence. A case conference was conducted between the probation officer and his supervisor and approval was granted to conduct the administrative search. Here, the determination was not based on an informant's tip, so the reliability of the informant was not at issue. The approval for the administrative search was granted based on the probation officer's and other law enforcements' personal observations that they reasonably suspected that Tingle was engaged in drug dealing.

Trial counsel was not deficient in failing to file a motion to suppress the administrative search of Tingle's residence that counsel believed had no merit. Counsel's belief that any such motion was meritless is objectively reasonable in light of the facts and circumstances of this case. This claim is without merit.

## Claim II- Failure to Correct the Record

Tingle contends that trial counsel was ineffective for failing to correct the record after Detective Radcliffe mistakenly testified on cross-examination that he located additional heroin in the center console of the vehicle during the car stop. Tingle contends that he was prejudiced because this error in testimony was the sole piece of evidence placing Tingle in actual, physical control of the heroin during the car stop.

Detective Radcliffe testified on direct examination that the only drugs recovered during the car stop were the 650 bags of heroin located in Dunfee's pants.[108] However, at the end of trial counsel's cross-examination, Detective Radcliffe mistakenly testified that additional heroin was located in the center console of the vehicle during the car stop.[109]

This mistaken testimony was never mentioned, argued, or referred to again by either the State or by defense counsel. Neither party mentioned this testimony during closing argument or at any other time.

Any error in failing to correct improperly admitted testimony may be deemed to be harmless when the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction.[110] In this case, the error was harmless.

The State, and the Court, made it clear to the jury that possession does not have to be actual but can be constructive.[111] The Court instructed the jury:

> Possession includes actual possession and constructive possession. . . Constructive possession means the substance was within defendant's reasonable control. That is, in or about the defendant's person, premises, belongings or vehicle. In other words, defendant had constructive possession over a substance if defendant had both the power and the intention at a given time to exercise control over the

---

[108] *Def. App.* 232-233, 246-247.
[109] *Def. App.* 253-254.
[110] See, *Wilson v. State,* 2022 WL 212692, *4 (Del.); *Cooke v. State,* 97 A.3d 513, 547 (Del. 2014); *Saavedra v. State,* 225 A.3d 364, 384-385 (Del. 2020).
[111] *Def. App.* 212, 578-580, 632-633.

substance either directly or through another person. Possession may be sole or joint. . . Possession is proven if you find beyond a reasonable doubt defendant had actual or constructive possession, either alone or jointly with others.[112]

In this case, the evidence presented at trial was that Dunfee had 650 bags of heroin in his possession during the car stop, and Tingle had $2,000 in his possession of suspected drug proceeds. That drug dealers often work in pairs, with one holding the money and the other the drugs. In the trunk of Tingle's car, parked at the Hillside residence garage, another 650 bags of heroin were found. The vast majority of the heroin in Tingle's locked car was the same type of heroin found on Dunfee during the car stop. Tingle's car parked in Dunfee's garage was locked and Tingle was the only person that had a key to his car. Tingle, therefore, was the only person that had access to the trunk of the locked car.

There was a plethora of evidence presented at trial that Tingle was engaged in drug dealing and that he had constructive possession of the drugs from the car stop and the drugs in his car.

Any error in failing to correct the record was harmless. Tingle has not suffered actual prejudice as a result thereof. This claim is without merit.

---

[112] *Def. App.* 632-633.

## Claim III: Failure to Request Litigation Packets for the Lab Reports

Tingle contends that trial counsel was ineffective for failing to obtain the underlying notes and supporting documentation ("litigation packets") that supported the reports by the forensic chemists Kyle Brown and Mollie Mares, both employees of NMS Labs, that determined the substances seized were in fact heroin. Tingle claims that he suffered prejudice because if a continuance was granted to allow him the opportunity to obtain the litigation packets, Tingle would have had time to obtain new counsel and if the continuance was not granted, he would have had an appellate issue that somehow would have led to a reversal of his conviction.

The heroin seized by Detective Radcliffe during the car stop was tested by forensic chemist Kyle Brown.[113] The heroin seized by the Wilmington Police Department during the search of Tingle's Audi was tested by forensic chemist Mollie Mares.[114] Mollie Mares' report was turned over to trial counsel on September 18, 2017.[115] Kyle Brown's report was turned over to trial counsel on December 1, 2017.[116] Trial counsel did not request the litigation packet for either report.

---

[113] *Def. App.* 662-663.
[114] *Def. App.* 664-666.
[115] *Def. App.* 192.
[116] *Def. App.* 193.

Trial counsel did file a motion to suppress Kyle Brown's report due to its late submission to the defense.[117] During the hearing on the suppression motion, trial counsel represented that had the lab report been produced in a timely manner, Tingle may have sought an independent review of the determination that the substance examined was indeed heroin.[118] Trial counsel then conceded that in his experience, with the exception of the problems in the Medical Examiner's Officer which have now been rectified, he was not aware of the existence of any matter in which a lab report was found to be in error in determining that the substance was heroin.[119] The following exchange then occurred:

> COURT: . . . To your knowledge, is it standard procedure to have independent review of those lab tests?
>
> TRIAL COUNSEL: In my experience, it is not, Your Honor.
>
> COURT: All right. And, also, in your experience and to your knowledge, with the exception of the problems in the Medical Examiner's Officer, which now have been rectified, has there ever been a finding that those lab reports were inaccurate?
>
> TRIAL COUNSEL: In my direct experience and knowledge, no, Your Honor.[120]

In denying the suppression motion, the Court stated that there was no actual prejudice to Tingle for the late submission of the lab report as it was unlikely that

---

[117] *Def. App.* 124-126.
[118] *Def. App.* 189-190.
[119] *Def. App.* 190-191.
[120] *Def. App.* 191.

22

any opposing expert would have been retained to determine whether the substance was indeed heroin. There was no suggestion that there was any possibility of error on the part of the state medical examiner. And, of course, once the evidence is admitted, the medical examiner witness would be subject to cross-examination.[121]

Tingle relies on *Oliver v. State*,[122] in support of his position that not requesting the litigation packet was deficient because the trial would have been continued, or if the trial was not continued, the convictions would be reversed on appeal. In *Oliver*, however, the defendant specifically identified how the State's discovery violation of the late production of the forensic chemist's notes caused actual prejudice.[123] In *Oliver,* an additional chemist was also involved in the testing and was not presented by the State as a witness and was not subject to cross-examination. The defendant was not provided with the opportunity to investigate that second chemist's actions and reputation. The defendant also identified the type of expert he might have hired and the data on which the expert might have opined.[124]

That is not the situation presented here. In this case, the forensic chemists involved in the testing of the drugs at issue and the preparation of their respective findings testified as witnesses at trial and were subject to cross-examination. There

---

[121] *Def. App.* 195.
[122] *Oliver v. State,* 60 A.3d 1093 (Del. 2013).
[123] See, *Oliver v. State,* 60 A.3d 1093, 1098-99 (Del. 2013).
[124] *Id.*

was nothing in their reports that raised any possible issues of any irregularities. It is not standard procedure to hire an expert to independently review the lab results and there was no showing of any actual prejudice that resulted in not having done so here.[125]

Trial counsel was not deficient in failing to request the litigation package for the lab reports determining that the substances were heroin, when, in counsel's experience, the lab reports were never found to be inaccurate. Trial counsel is not required to engage in an exercise in futility merely to buy more time or to create an appellate issue. Also, there is no actual prejudice as a result thereof because even if the litigation packet had been obtained, it was extremely unlikely that an expert would have been retained to review the report, and even more unlikely that the lab results would be deemed inaccurate in any respect.

Moreover, in this case, the defense strategy was to deny that Tingle had anything to do with the drugs seized by law enforcement. Tingle had elected an "all or nothing" defense strategy.[126] The defense strategy was that Tingle was in no way responsible for any of the contraband that had been located and connected to him through police investigations.[127] Here, the defense strategy was not to claim that the substances seized were not, in fact, heroin but instead to distance Tingle

---

[125] See, *Def. App.* 191, 195.
[126] Trial Counsel Affidavit in response to Rule 61 motion, at ¶¶ 13-15.
[127] *Id.*

24

from the drugs.[128] The defense strategy was to claim that Dunfee was the drug dealer and Tingle had nothing to do with the drugs.

Trial counsel was not deficient in failing to request the litigation packet for the lab reports determining the substance seized was heroin. Moreover, Tingle did not sustain his burden of establishing any actual prejudice as a result thereof. This claim is without merit.

**Claim IV: Failure to Meaningfully Challenge the State's Drug Dealing Expert**

Tingle contends that trial counsel was ineffective for failing to challenge the State's drug dealing expert as to his conclusions pertaining to Tingle's and Dunfee's respective roles.

Trial counsel filed a motion to suppress Detective Stewart's testimony, the State's drug dealing expert, due to the late identification of this witness.[129] The Court denied trial counsel's motion to exclude Detective Stewart's testimony but ruled it could not be cumulative or duplicative of the testimony of the investigating officers.[130]

During Detective Stewart's direct examination, he was asked to distinguish between drug dealers and drug users.[131] Trial counsel objected to this line of

---

[128] *Id.*
[129] *Def. App.* 132-134.
[130] *Def. App.* 197-198.
[131] *Def. App.* 433.

questioning as outside the scope of his disclosed testimony.[132] The Court agreed with the State that it was standard testimony of a drug expert to distinguish between dealers and users.[133]

Detective Stewart testified that it was his opinion, based on the totality of the circumstances, that Tingle was engaged in drug dealing.[134] He was not asked specifically if Dunfee was also a drug dealer. The State asked Detective Stewart if he was to focus just on the small amount of heroin found in Dunfee's bedroom, would he be able to form an opinion as to whether Dunfee was a drug user. Detective Stewart responded that while it was possible that Dunfee was a drug user, Detective Stewart was unable to form an opinion as to whether he was based on the small amounts of heroin found in his bedroom.[135]

The Superior Court held that Detective Stewart was not exceeding the scope of his disclosure by distinguishing between drug dealers and drug users. He testified that Tingle was a drug dealer. He did not formulate any opinion as to whether Dunfee was a drug user, a drug dealer, or both.

Trial counsel was not deficient in his handling of the examination of Detective Stewart. He first sought to have Detective Stewart's testimony excluded in its entirety due to the late identification of him as a witness, and when he did not

[132] *Def. App.* 434.
[133] *Def. App.* 434.
[134] *Def. App.* 454-456.
[135] *Def. App.* 457.

prevail on that motion, he conducted an extensive cross-examination and did what he could to elicit favorable testimony.[136]

Trial counsel was not deficient in this regard. Moreover, Tingle cannot sustain his burden to establish actual prejudice as a result of the admission of this testimony. This claim is without merit.

### Claims V and VI: Failing to Substantively Meet with Tingle

In Claim V and VI, Tingle contends that trial counsel was ineffective by failing to have any meaningful discussion with him about his testimony prior to taking the stand.

Tingle's trial counsel advised that Tingle's trial testimony was not reviewed at length prior to his taking the stand because it was clear that Tingle would be taking the same position that he had taken at all stages of pretrial proceedings: that he was in no way responsible for any of the contraband that had been located and connected to him through police investigations.[137] A review of Tingle's trial testimony reveals that trial counsel conducted a full and thorough direct examination that clearly and cogently laid out Tingle's version of the case.[138] At all stages of trial, trial counsel represented Tingle as vigorously as possible while

---

[136] *Def. App.* 458-477.
[137] *Trial Counsel's Affidavit in response to Rule 61 Motion,* at ¶¶ 15, 19.
[138] *Def. App.* 515-542.

trying to implement Tingle's chosen "all or nothing" defense.[139]  In fact, through the advocacy of Tingle's trial counsel, Tingle was found not guilty of PFDCF, a serious charge.

The State's theory at trial was that Tingle was a drug dealer.  Dunfee was his employee, the rental car and drug paraphernalia were tools of his trade, the drugs were the product he was selling, the cash was his profit, and the firearm was his security.[140]

As to Claim V, Tingle claims that his trial counsel's failure to anticipate and respond to the hearsay objection as to the ownership of the gun at issue removed a viable defense from the jury's consideration and that his subsequent conviction for PFBPP was directly linked to this testimony.

Tingle is incorrect in this regard.  The hearsay objection did not impact Tingle's testimony in any respect, and it did not remove "a viable defense from the jury's consideration."  On direct examination, Tingle started to inject some hearsay testimony about what Dunfee told him about the gun at issue.[141]  The hearsay objection was addressed.[142]  Tingle's trial counsel then elicited the same testimony regarding the ownership of the gun from Tingle without any hearsay issues.  Tingle testified on direct examination that he had never previously seen the firearm in

---

[139] *Trial Counsel's Affidavit in response to Rule 61 Motion,* at ¶ 19.
[140] *Def. App.* 575-576.
[141] *Def. App.* 531-532.
[142] *Def. App.* 534-535.

Dunfee's bedroom until Dunfee showed it to him. That was the first time he ever saw it. And that Tingle had no knowledge of the firearm.[143]

The record reflects that Tingle's position on this issue was not impacted in any way by the hearsay objection and thereafter rephrasing of the question to elicit the same testimony.

In Claim VI, Tingle contends that his counsel was ineffective and that he suffered prejudice by trial counsel failing to prevent the admission of his prior convictions under Delaware Uniform Rules of Evidence ("D.R.E.") 609.

Following the close of the State's case, and before Tingle made the decision as to whether or not he wanted to testify, there was a hearing on the admissibility of Tingle's multiple felony convictions.[144] The State outlined Tingle's prior convictions that it was seeking to introduce at trial under D.R.E. 609 should Tingle decide to testify. The State advised that it was seeking to introduce his convictions within the last ten years of: Burglary Second Degree- a crime of dishonesty, PFDCF, Conspiracy in the Second Degree and Maintaining a Vehicle. It was also seeking to introduce older crimes of dishonesty: convictions of burglary second degree from 1996, attempted theft and felony theft from 1996, receiving stolen property felony conviction from 1996, and attempted theft misdemeanor from 1996.

---

[143] *Def. App.* 535.
[144] *Def. App.* 483-487.

Tingle's trial counsel objected to the admissibility of the crimes of dishonesty that did not fall into the ten-year window as being unduly prejudicial.[145] The Court agreed with Tingle's trial counsel and held that the crimes of dishonesty more than ten years old would not be admissible at trial.[146]

Tingle's trial counsel represented that he had met with Tingle on numerous occasions and has discussed with him the consequences that his criminal record may have on his trial testimony, should he elect to testify at trial.[147] That whatever decision Tingle made as to whether or not to testify, it was being made on a knowing, voluntary and intelligent basis, and that he was fully advised of his rights.[148]

Prior to Tingle making his decision, the Court also advised Tingle that if he chose to testify the jury was going to hear about his crimes of dishonesty.[149] The Court then engaged in a colloquy with Tingle during which Tingle advised that he knew the jury was going to hear about his prior crimes of honesty. That he had decided to testify in his own defense. That he had discussed this with decision with his attorney and that he, alone, was making this decision for himself.[150]

---

[145] *Def. App.* 486.
[146] *Def. App.* 486-487.
[147] *Def. App.* 485-486.
[148] *Def. App.* 485-486.
[149] *Def. App.* 487.
[150] *Def. App.*487-489.

In this case, after a discussion about his prior convictions and a colloquy with the Court, Tingle made the decision to waive his right to remain silent and chose to testify. The Court found Tingle's decision to be knowing, intelligent and voluntary.[151] Prior to Tingle testifying, the State reiterated that all four of Tingle's felony convictions within the last ten years were admissible for impeachment.[152]

Tingle was aware that all four of his felony convictions within the last ten years were admissible for impeachment at trial. The State reiterated that fact immediately before Tingle took the stand to testify.

In order to prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate that, but for counsel's alleged error, he would have been acquitted.[153] If substantial evidence exists that supports the defendant's conviction, the defendant's claim is undermined.[154]

In this case, to the extent there was any error in the admission of his prior felony convictions, any such error was harmless. The fact that he was previouoly convicted of PFDCF did not prejudice the jury in this case because the jury acquitted him of the PFDCF charge in this case. In this case, substantial evidence existed that supported the verdict in this case on all the charges.

---

[151] *Def. App.* 488.
[152] *Def. App.* 488-489.
[153] *Couch v. State,* 945 A.2d 593 (Del. 2008).
[154] *Id.*

Trial counsel was not deficient and based on the abundance of evidence presented at trial, Tingle cannot meet his burden to show actual prejudice as a result thereof. This claim is without merit.

## Claim VII:  Trial Counsel's Relationship was Broken/Social Media Postings

Tingle claims that he suffered prejudice by having trial counsel represent him after their relationship was irretrievably broken.

Although Tingle contends that there was a complete breakdown of the attorney-client relationship, the record does not reflect a breakdown. Trial counsel represents that at all stages of the trial, counsel represented Tingle as vigorously as possible while trying to implement Tingle's chosen "all or nothing" defense.[155]

Trial counsel represents that during conversations and in correspondence to Tingle, counsel repeatedly explained the nature of the evidence against Tingle, and the possible penalties that were entailed should he be convicted at trial.[156]  Trial counsel represents that Tingle actively participated in all stages of trial and was given every opportunity to request that counsel further probe witnesses on cross-examination. Tingle took advantage of this at times and at other times declined to do so.[157]

---

[155] Trial Counsel's Affidavit in response to Rule 61 Motion, at ¶ 19.
[156] *Id.* at ¶ 10.
[157] *Id.* at ¶ 20.

The record reflects that defense counsel consistently, vigorously and diligently defended the charges against Tingle. Defense counsel made tactical decisions regarding evidentiary issues, vigorously cross-examined the State's witnesses, and vigorously defended Tingle.

Prior to trial, Tingle was offered a plea with a sentence recommendation of 27 years of prison time, 25 years of which was mandatory. Tingle rejected the plea offer and proceeded to trial. Through trial counsel's advocacy, Tingle was found not guilty of PFDCF, and ultimately sentenced to 20 years of unsuspended prison time, 17 years of which was mandatory. Tingle achieved a better result at trial than the best plea offered by the State. Whatever tactical and strategic decisions resulted in the verdict, when reviewing the entire proceeding, the record reflects counsel's overall performance as being active, diligent, thorough and capable advocacy.

Tingle's disgruntlement with his trial counsel appears to be driven by his disappointment with the trial result. The jury did not accept his "all or nothing" defense that he was just at the wrong place at the wrong time.

It is difficult to establish an ineffective assistance of counsel claim when counsel's overall performance indicates active and capable advocacy.[158]

---

[158] *Harrington v. Richter,* 131 S.Ct. 770, 791 (2011).

Specifically, Tingle claims that his expression of dissatisfaction on the morning the trial was set to begin, along with trial counsel's handling of Dunfee's affidavit, and trial counsel's private social media posts establish that their relationship was irretrievably broken.

As to Tingle's comments on the morning the trial was scheduled to begin, Tingle expressed dissatisfaction with his trial counsel's inability to give "definite answers to yes or no questions" about what might occur during the trial.[159] Trial counsel explained that "with certain questions about how things will be done at trial, there is not a way to answer it 100 percent in the affirmative or negative. Largely, it is dependent on what the evidence and testimony on record reveals that will inform certain decisions that are made.[160]

On direct appeal, Tingle claimed that the Superior Court erred when it denied his 11th-hour request for a continuance so that he could fire his privately retained counsel to hire another lawyer.[161] The Delaware Supreme Court found no merit to Tingle's claims and affirmed the Superior Court's judgment.

The Delaware Supreme Court determined that the denial of a continuance for change of counsel on the eve of trial is not an abuse of discretion when 1) there had been no previous complaint about counsel; 2) the defendant had a prior

---

[159] *Def. App.* 201-204.
[160] *Def. App.* 202-203.
[161] *Tingle v. State,* 2019 WL 2079060 (Del.).

34

opportunity to obtain substitute counsel; and 3) obtaining substitute counsel was uncertain and appeared to be a dilatory tactic.[162]

The Delaware Supreme Court held that, in this case, Tingle had not expressed any prior dissatisfaction with trial counsel until the day of trial. Tingle had the opportunity to replace his privately retained counsel seven months before trial, and a continuance on the day of trial would have unnecessarily delayed the trial.[163] Tingle did not indicate a breakdown in communication or irreconcilable conflicts with trial counsel. He never stated that he wanted to fire his counsel and proceed *pro se.*

Tingle hired trial counsel in May 2017, seven months before trial.[164] He had the means to hire his attorney, he also had the means to fire his attorney and hire a new one. Tingle provides no explanation as to why, if the relationship with trial counsel was genuinely irretrievably broken, he had not replaced him prior to trial.

Turning to the issue of Dunfee's affidavit, Tingle argued that Dunfee's affidavit and trial counsel's failure to attempt to introduce it at trial, was fatal to their relationship.

In September 2017, after this case was indicted, the State met with Dunfee. Dunfee admitted to being a heroin user, and said he met Tingle because Tingle sold

---

[162] *Tingle v. State,* 2019 WL 2079060, *3 (Del.).
[163] *Id.*
[164] *Def. App.* 39.

drugs to him. The relationship escalated to Dunfee becoming Tingle's employee and Tingle giving Dunfee drugs to move for him. Dunfee would go with Tingle to Philadelphia, where Tingle would get $17,000 worth of heroin every other week to distribute to people in Delaware.[165] Dunfee also talked about the Desert Eagle firearm. He said the gun was Tingle's and that Tingle gave it to him to keep safe. Dunfee stated that he thought he was supposed to be the coverup for the gun. The one to take the rap and take the gun charge.[166]

In October 2017, the State received an email from trial counsel that attached an affidavit from Dunfee. The affidavit was not dated and directly contradicted the recorded statement given to law enforcement.[167] In the affidavit from Dunfee, he admitted that the drugs at issue belonged to him, not Tingle.[168] This affidavit, and whether trial counsel would attempt to admit it, Tingle claims were "fatal" to the relationship between Tingle and his attorney.[169]

Trial counsel represented that he did not attempt to admit the affidavit because it directly contradicted Dunfee's previously recorded statement and would have further served to undermine Tingle's goal of seeking a not guilty verdict as to

---

[165] See, *Def. App.* 770-771.
[166] See, *Def. App.* 770-771.
[167] State's supplemental response to Rule 61 motion dated June 17, 2022, * 1-2.
[168] Tingle's Amended Motion for Postconviction Relief, at *113.
[169] *Id.*

36

all counts.[170] Trial counsel had discussions with Tingle about Dunfee's affidavit prior to trial.[171]

In addition to tactical considerations that it would be better not to use the affidavit, trial counsel also had serious concerns that offering the affidavit would be a violation of Delaware Lawyers' Rule of Professional Conduct 3.3.(a)(3), which mandates that counsel not offer testimony that the lawyer knows to be false.[172]

Trial counsel made the strategic choice not to seek to admit the affidavit.[173] Great weight and deference are given to tactical decisions by the trial attorney. There is a strong presumption that counsel's conduct was reasonable and constituted sound trial strategy.[174] Trial counsel must be given wide latitude in making tactical decisions.[175] Defense counsel was not ineffective in his tactical decision in this regard.

In addition, it appears that the affidavit was inadmissible hearsay that could not be introduced at trial. Dunfee, an indicted co-defendant, was scheduled for

---

[170] Trial Counsel's Affidavit in response to Rule 61 Motion, at ¶¶ 17-18.
[171] *Id.* at ¶ 18.
[172] Trial Counsel's supplemental submission dated April 20, 2022, at pgs. 1-2.
[173] *Id.*
[174] *Harrington v. Richter,* 131 S.Ct. 770 (2011); *Outten v. State,* 720 A.2d 547, 557 (Del. 1998); *Strickland v. Washington,* 466 U.S. 668, 689 (1984).
[175] *Id.*

37

trial on the same day as Tingle. However, he failed to appear on the trial date and a capias was issued.[176]

Despite Tingle's disappointment that Dunfee's affidavit would not be used at trial, the record does not reflect that there was a complete breakdown in the attorney-client relationship as a result thereof.

Finally, Tingle complains about trial counsel's social media posts.[177] Tingle does not argue that trial counsel's social media posts led to *Strickland* prejudice,[178] but argues that it is proof of a breakdown in the attorney-client relationship.

There is no denying, and trial counsel does not deny, that the social media posts were a "lapse in judgment." However, trial counsel explains that these three posts were made on his private, not public, social media page and only accessible to a limited audience.[179] While there is no question that these social media posts are inappropriate, they do not appear to be violative of the Delaware Lawyers' Rules of Professional Conduct or ABA standards because there is no evidence that they had a substantial likelihood of prejudicing the trial.[180]

---

[176] *Def. App.* 185-186.
[177] See, *Def. App.* 955-957.
[178] See, Rule 61 Counsel's June 17, 2022, Supplemental Submission, at *9.
[179] Trial Counsel's supplemental submission dated April 20, 2022, at pgs. 1-2.
[180] See, *DLRPC R.* 3.6(a) and ABA Standards for Criminal Justice Defense Function R. 4-1.4 (3d ed. 1993).

Given the limited audience, there is no evidence that the posts had a substantial likelihood of prejudicing the trial. Further, there were no specific details mentioned. The posts did not contain the defendant's name, the charges, the court nor the county where the case was being tried. [181]

Tingle does not contend he was prejudiced at trial by these posts. He just references these posts as a reflection of the breakdown in communication.

The Court does not agree that the social media posts reflect a breakdown in communication. The record reflects to the contrary. The record reflects that trial counsel did provide active, diligent, thorough, and capable advocacy. The social media posts reflect that trial counsel recognized that the evidence against his client was overwhelming and that his client was unlikely to be successful at trial.[182] Of course, social media posts are not the forum to privately express frustrations. Whether trial counsel's remarks should result in an extra-judicial disciplinary

---

[181] Trial Counsel's supplemental submission dated April 20, 2022, at pgs. 1-2.

[182] There are a total of three posts.

The first, dated January 5, 2018 states: "Day two of rearranging the deck chairs of the Titanic, i.e. the case I'm trying." *Def. App.* 955.

The second, dated January 9, 2018 states: "Well, we closed and charged the jury in the case I've been in trial with since last Wednesday. The jury left the court to deliberate around twenty after twelve this afternoon. They're still out. I'm a little surprised that they're taking this long. Who knows, maybe that means I've won on a charge or two." *Def. App.* 956.

The third, dated January 9, 2018 states: "Update, jury was out 3 hours deliberating. Returned verdicts of guilty on all but two counts." *Def. App.* 957.

finding is not the issue presently to be decided in this Rule 61 motion. This Rule 61 motion is not the appropriate venue to redress such grievances.

Trial counsel was not deficient in his representation of Tingle and Tingle has failed to establish actual prejudice as a result of any alleged deficiency.

## **CONCLUSION**

Tingle has failed to meet his burden to establish that trial counsel's conduct was deficient, and he has failed to establish actual prejudice as a result of any alleged deficiency. Tingle's ineffective assistance of counsel claims are without merit.

For all of the foregoing reasons, Tingle's Motion for Postconviction Relief should be DENIED.

**IT IS SO RECOMMENDED.**

/s/ Lynne M. Parker
Commissioner Lynne M. Parker

cc:    Prothonotary
Marc Wienkowitz, Esquire